**Matter of Howard F. BARRETT, Jr.**

Supreme Judicial Court of Maine.

Argued June 2, 1986.

Decided July 18, 1986.

Merle W. Loper (orally), Portland, for Committee on Judicial Responsibility and Disability.

Vafiades, Brountas & Kominsky, Lewis V. Vafiades (orally), Bangor, for respondent.

Before McKUSICK, C.J., and ROBERTS, VIOLETTE, WATHEN and GLASSMAN, JJ.

PER CURIAM.

In this judicial discipline case, the Supreme Judicial Court is sitting in the exercise of its original trial jurisdiction to find facts and to make rulings of law. This case was initiated by the filing on February 21, 1986, of a report by the Committee on Judicial Responsibility and Disability alleging that Howard F. Barrett, Jr., Judge of Probate for Waldo County, has in three instances violated the Code of Judicial Conduct. Specifically, the Committee's report asks this court to find that the respondent violated Canon 3(A)(5)[1] of the Code by

---

1. Me. Code of Jud. Conduct Canon 3(A)(5) states: "A judge should dispose promptly of the business of the court."

delaying decision, or declining to decide cases, without legal justification.[2]

## I.

The Committee's allegations against Judge Barrett arise out of his handling of three matters submitted to him for decision in the Waldo County Probate Court. On the basis of the testimonial and documentary evidence stipulated by the parties, we make the following findings of fact with respect to those three cases.

### A. *Estate of Elmer E.*

The will of Elmer E., who died in April 1978, created a trust of which Elmer's sister Louise W. is the life income beneficiary, Shriners Hospital of Massachusetts the remainderman, and Depositors Trust Company of Augusta the trustee. The trustee was authorized "to invade the principal of this trust if necessary to insure the comfort, support, maintenance and happiness of my said sister," and was given broad powers of investment.

Soon after the trust was set up, Depositors decided that, to achieve proper diversification, it should sell the 750 shares of AT & T stock that constituted a quarter of the trust principal. Louise objected, believing that her brother would want her to retain that stock and that diversification would produce less return for herself as the income beneficiary. On February 22, 1979, Louise petitioned the Waldo County Probate Court to direct the trustee to retain the shares. Judge Barrett heard the matter on July 3, 1979.

By December 1981, more than two years after the hearing, Judge Barrett had made no decision, and Depositors' attorney wrote to the Waldo County Register of Probate detailing his unsuccessful attempts to that date to obtain a ruling from the judge. In 1982 the Committee on Judicial Responsibility and Disability investigated a formal complaint filed with it alleging excessive delay in Judge Barrett's decision of another case. The *Elmer E.* delay also came to the Committee's attention, but the Committee decided at that time not to pursue further the allegations against the respondent. In its letter of December 9, 1982, informing the respondent of its decision to dismiss the complaint against him, the Committee made no specific reference to the *Elmer E.* case, but did issue the following general warning: "[T]he Committee wants its records to reflect that it is not endorsing the view that a judge can properly discharge his judicial responsibilities by declining to decide a case properly submitted to the court." Judge Barrett still has not issued any decision in *Elmer E.*, even though now more than seven years have passed since the matter was submitted to him for decision following hearing.

Confronted with this long delay, the respondent defends himself by asserting that he has intentionally withheld decision in order to preserve the *status quo* existing at the time the 1979 petition was filed and that he thereby has fulfilled the obligation he conceives he owes to the testator to see to it that the trust is administered for Louise's "happiness." He states that the primary purpose of his nondecision is to

---

**2.** The Committee's report also urges that the same conduct of the respondent constitutes a violation of Canon 3(A)(4) of the Code of Judicial Conduct because his nondecision delayed or prevented the parties from getting appellate review. In pertinent part that canon provides:

A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law....

On the basis of the plain language of Canon 3(A)(4) and of its legislative history, we reject the expansive construction the Committee

would have us give that canon. *See* Me. Code of Jud. Conduct Canon 3(A)(4) committee's notes (discussion of only *ex parte* communications); E. Thode, *Reporter's Notes to Code of Judicial Conduct* 52–54 (ABA 1973) (discussion of only *ex parte* communications and judicial consultation with outside experts). In any event, the interference with litigants' appeal rights that results from deliberate deferral of trial court decisionmaking is fully sanctionable as an inevitable consequence of a violation of Canon 3(A)(5).

foster a good working relationship between the corporate trustee and Louise.

### B. *In re Brittany P.*

On June 7, 1984, when Brittany P. was seven months old, her father killed her mother, his ex-wife, and then committed suicide. Brittany was left in the care of her teenage maternal aunts and her maternal grandfather. Six different petitions seeking guardianship of Brittany were quickly filed in the Waldo County Probate Court. Petitioners included Brittany's teenage maternal aunt Julie H. and Brittany's maternal grandfather; Brittany's paternal grandparents; certain of Brittany's paternal cousins; certain friends of Brittany's mother; and a former baby-sitter for Brittany. Three days of informal hearings were conducted by Judge Barrett in July and November 1984. On the last day of hearings, November 21, Judge Barrett told the parties that he would try to make a decision by Christmas 1984. When he had failed to do so by the following February, the attorneys involved began calling the Probate Court. In May 1985, when no opinion was forthcoming, two of the attorneys filed formal complaints with the Committee on Judicial Responsibility and Disability. In answering those complaints, the respondent wrote the Committee a lengthy letter in July 1985 in defense of his then seven-month decisional delay. He there explained that he was purposely delaying a guardianship decision in the hope that the paternal and maternal branches of Brittany's family would mend their relationships to one another, so that both would be available to support Brittany emotionally as she grew up. In that July 1985 letter he stated that his "decision [was] well-framed in both mind and in writing and has been for some time, although additional writing and inquiry continues."

In October 1985 the Committee informed the respondent that a hearing was necessary on the complaints. The hearing originally set for early December 1985 was, because of illness of counsel, rescheduled to January 31, 1986. In the meantime, on December 27, 1985, Judge Barrett entered his decision appointing Brittany's aunt Julie as her sole guardian and denying the other petitions. At the Committee's hearing the respondent testified that his reasons for delaying issuance of a decision had been that he wanted to see how Brittany's aunt Julie worked out as her caretaker, in order to be sure that his initial decision was in Brittany's best interests; and that he wanted the two sides of Brittany's family, for her sake, to forgive and forget their shared tragedy and that he was afraid a quick decision would destroy any chance of that reconciliation. At no time, however, subsequent to the close of the hearings on November 21, 1984, did the judge receive any further evidence that would be proper for his consideration in deciding the multiple guardianship petitions pending before him. Furthermore, the respondent testified that he would have withheld his decision for much the same period of time even if he had been sure from the beginning which petitioner he should appoint as guardian.

### C. *In re Stephen C.*

On March 29, 1982, a petition for the appointment of a guardian and conservator for an incapacitated young man, Stephen C., was filed in the Waldo County Probate Court by his mother. Judge Barrett held a hearing on the petition on June 24, 1982. When six months later no one had raised any objection to the requested appointment, he appointed the mother as guardian and conservator, using a form order for that purpose. The *Stephen C.* case was not the subject of any formal complaint to the Committee, but instead was found by the Committee in the course of its investigation of the probate court records.

### II.

█ We conclude that Judge Barrett violated Canon 3(A)(5) of the Code by his intentional withholding of decision in the *Elmer E.* and *Brittany P.* cases. That

canon directed him in plain language to "dispose promptly of the business of the court." Instead of issuing his decision in the regular course following the close of all hearings, he deliberately delayed or permanently deferred issuing a decision, out of a belief that he knew best what would advance harmony among the litigating parties before his court. There is no suggestion whatever that the judge's delay was caused by the press of his court's caseload or by the complexity of the legal or factual issues involved in deciding these cases. Instead, the judge used the delayed timing of his decisions for the deliberate purpose of advancing what he, from his own personal view of each situation, saw as a desirable extrajudicial goal. The fault in Judge Barrett's course of purposeful conduct in *Elmer E.* and *Brittany P.* does not lie alone in the months and years of delay that resulted; rather, the principal fault lies in the fact that he determinedly administered his own personal brand of justice, in plain and direct violation of the standards governing a judge's performance of his high responsibilities. *Cf. Matter of Kohn*, 568 S.W.2d 255, 261 (Mo.1978) (four-year delay in deciding case was misconduct where judge delayed his ruling to avoid disrupting the relationship between a will beneficiary and her executrix-aunt). Any party to litigation has a right to prompt disposition of his case in court, subject to the further right to appeal any decision by which he is aggrieved. The respondent deliberately interfered with those rights without legal justification.

■ The *Stephen C.* case, which was decided very shortly after the Committee's warning letter to the respondent dated December 9, 1982, does not involve the kind of conscious, purposeful use of nondecision presented by the other two cases. For that reason, while we do not condone a delay of six months after hearing before issuing a simple form order, we do not find that the third instance of delay by itself rises to a level appropriate for judicial discipline.

■ We now turn to the choice of an appropriate sanction. "Any sanction must be designed to preserve the integrity and independence of the judiciary and to restore and reaffirm the public confidence in the administration of justice." *Matter of Ross*, 428 A.2d 858, 868–69 (Me.1981). We find as a fact that the respondent is a conscientious judge who believed, in subjective good faith, though mistakenly, that a delayed decision or a nondecision was in the best interests of the parties in *Elmer E.* and *Brittany P.* In selecting the appropriate sanction we are mindful that the record before us does not disclose any specific prejudice of serious proportion that has resulted to the private parties in these cases. At the same time, the respondent acted in direct disregard of the plain mandate of Canon 3(A)(5), as well as of the Committee's specific warning to him of December 9, 1982, that a judge cannot "properly discharge his judicial responsibilities by declining to decide a case properly submitted to [him]." That conduct is sanctionable not only because it causes loss of respect and confidence in the court system, but also because it represents a deliberate departure from the standard of conduct demanded of all judges.

In all these circumstances our clear declaration that the respondent has in two instances deliberately violated his judicial duty to dispose promptly of the business of his court, plus this public reprimand, are adequate to serve the purposes of judicial discipline, namely, "to announce publicly our recognition that there has been misconduct; ... to deter the individual being sanctioned from again engaging in such conduct and to prevent others from engaging in similar misconduct in the future." *Matter of Ross*, 428 A.2d at 868–69.

It is ADJUDGED that Judge Howard F. Barrett, Jr., has in two instances violated Canon 3(A)(5) of the Code of Judicial Conduct.

It is ORDERED that he be, and he hereby is, reprimanded for those violations.

All concurring.