**2003 ME 124**

**In re Honorable James P. DUNLEAVY.**

Supreme Judicial Court of Maine.

Argued: June 10, 2003.

Decided: Oct. 22, 2003.

---

H. Cabanne Howard, Asst. Professor (orally), University of Maine School of Law, Portland, for the Committee on Judicial Responsibility and Disability.

James E. Mitchell, Esq. (orally), Jim Mitchell and Jed Davis, P.A., Augusta, for Judge Dunleavy.

Panel: CLIFFORD, and RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

Majority: RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

Concurrence: CLIFFORD, and LEVY, JJ.

DANA, J.

[¶ 1] The Committee on Judicial Responsibility and Disability (the Committee) in its report dated February 17, 2003, asserts that Aroostook County Judge of Probate James P. Dunleavy violated Canons 5(A)(3) [1] and 5(A)(1)(e) [2] of the Judicial

---

1. Canon 5(A)(3) provides that "[a] judge shall resign from judicial office upon becoming a candidate for any elective office, except that a judge of probate may be a candidate for re-election while holding that office, provided that the judge complies with the provisions of section C of this Canon." Maine Code of Jud. Conduct Canon 5(A)(3).

2. Canon 5(A)(1)(e) provides that a judge shall not "solicit funds for, pay an assessment to, or make a contribution to a political organiza-

Code of Conduct (the Code) and recommends that we impose appropriate discipline. We conclude that Judge Dunleavy did violate Canons 5(A)(3) and 5(A)(1)(e), but on these unique facts, impose no discipline.

## I. BACKGROUND

[¶ 2] On August 14, 2002, the Committee received a complaint alleging that Judge Dunleavy had violated both Canon 5(A)(3) of the Code by running for the Maine State Senate without first resigning his position as Judge of Probate and Canon 5(A)(1)(e) by soliciting contributions in support of his candidacy.[3] Shortly thereafter, the Committee notified Judge Dunleavy of the complaint.[4] Judge Dunleavy responded and admitted that he was then running for the State Senate while holding office as probate judge[5] and that he had solicited 150 five-dollar contributions to qualify for public campaign funding from the Maine Clean Elections Fund.[6] However, he argued that 4 M.R.S.A. § 312 (Supp. 2002) (hereinafter, section 312) authorizes a probate judge to run for another elected office without first resigning his judicial office and that the statute supersedes the

Code. Judge Dunleavy also asserts that the Maine Constitution supports the right of sitting probate judges to run for other elected offices.

[¶ 3] On November 20, 2002, the Committee notified Judge Dunleavy that it considered his actions violations of the Code of Judicial Conduct and that it was prepared to report the case to the Law Court. Before reporting the case, the Committee offered Judge Dunleavy a hearing but indicated that it did not consider a hearing necessary because the material facts were undisputed. The Committee explained that it was not within its authority to determine whether section 312 overrode the Code, and if it did, whether that constituted an unconstitutional invasion by the Legislature of the Judicial Branch's inherent power to discipline its members. The Committee later clarified that it considered Judge Dunleavy's solicitation of five-dollar Clean Elections qualifying contributions to be "funds" within the meaning of Canon 5(A)(1)(e) because that money ultimately enabled the public funding of his entire campaign. Judge Dunleavy waived his right to a hearing before the Committee.

tion or candidate, or purchase tickets for political party dinners or other functions . . . ." *Id.* Canon 5(A)(1)(e).

3. The complainant also alleged that Judge Dunleavy violated Canon 5(C)(3) by soliciting contributions "more than 90 days after the last election for Judge of Probate and more than one year before the next election for Judge of Probate." The Committee did not address this allegation nor has it presented this allegation as part of the reported question.

4. Also on September 10, 2002, the Judicial Ethics Committee issued an advisory opinion in which it concluded that a sitting judge of probate should resign his position before seeking the office of State Senator because he does not fall within the existing exception for candidates for reelection as judge of probate.

Judicial Ethics Comm., 02–5, 18 Me. B.J. 56, 58 (Sept. 10, 2002). We may consider this advisory opinion when making our decision but are not bound by it. *Mitchell v. Judicial Ethics Comm.*, 2000 ME 83, ¶ 3, 749 A.2d 1282, 1283.

5. Judge Dunleavy won the Democratic Party's primary election for Senate District 2 on June 11, 2002. His name appeared on the ballot November 5, 2002, but he lost the general election. During that time, Judge Dunleavy served as Aroostook County Probate Judge and continues to do so.

6. To qualify for public funding, the Clean Elections Act requires a State Senate candidate to collect 150 five-dollar qualifying contributions. 21–A M.R.S.A. § 1125(3) (Supp. 2002).

[¶ 4] Pursuant to the Supreme Judicial Court's order establishing the Committee,[7] and Committee Rules 2(I)[8] and 3,[9] the Committee reported the matter to us.

## II.  DISCUSSION

### A.  Introduction

[¶ 5] Our discussion of the issues must begin with reference to the overriding provisions of our Maine Constitution which establish the authority, responsibility, and independence of all judges. · Separation of powers of the Executive, Legislative, and Judicial Branches is mandated by Article III of the Maine Constitution.  Article III states:

### § 1.  Powers distributed

Section 1.  The powers of this government shall be divided into 3 distinct departments, the legislative, executive and judicial.

### § 2.  To be kept separate

Section 2.  No person or persons, belonging to one of these departments, shall exercise any of the powers proper-

ly belonging to either of the others, except in the cases herein expressly directed or permitted.

ME. CONST. art.  III.

■  [¶ 6] In interpreting Article III, we have stated: "[T]he separation of governmental powers mandated by the Maine Constitution is much more rigorous than the same principle as applied to the federal government." *State v. Hunter,* 447 A.2d 797, 799 (Me.1982).  The limitation in Article III that no person belonging to any one branch of government shall exercise the powers of any other branch of government necessarily requires that a constitutional grant of power to one branch of government effectively forbids the exercise of that power by any other of the three branches of government.  *Id.* at 800; *Bossie v. State,* 488 A.2d 477, 480 (Me.1985).

[¶ 7] The Judicial Branch's powers are established pursuant to Article VI, Section 1 of the Maine Constitution, which states:

Section 1.  The judicial power of this State shall be vested in a Supreme Judicial Court, and such other courts as the

---

7.  Section 9(ii) provides:
    If after the completion of the Committee's investigation and hearing, if any, the Committee determines ... that in fact the person has violated the Code as applicable and that the violation is of a serious nature so as to warrant formal disciplinary action, the Committee shall file a report of its findings with the Supreme Judicial Court together with a statement of the alleged charges, a recommendation as to action by the Court, the transcript of any hearing, and any exhibits considered by the Committee.  Any further proceedings shall be before the Court.
    Rules of the Committee on Judicial Responsibility and Disability, Order Establishing Committee on Judicial Responsibility and Disability, § 9(ii) (1978).

8.  Rule 2(I) provides in pertinent part, "If the Committee decides that a charge has been

established, it shall report its decision to the Supreme Judicial Court and shall provide to the judge and any complainant written notice of its decision to report to the Court."  *Id.* Rule 2(I).

9.  Rule 3 provides:
    A report to the Supreme Judicial Court shall include a statement of the alleged charges, a statement of the Committee's findings of fact and conclusions of law, and a recommendation of action by the Court. A copy of such report shall be provided to the judge.  The report shall be accompanied by the complete record of the matter before the Committee including the transcript of any hearing and any exhibits considered by the Committee.  Any further proceedings shall be before the Court.
    *Id.* Rule 3.

Legislature shall from time to time establish.

ME. CONST. art. VI, § 1.

[¶ 8] The judicial power vested in the Supreme Judicial Court includes the authority to regulate the professional conduct of judges. *In re Benoit,* 487 A.2d 1158, 1170 (Me.1985) ("The Supreme Judicial Court, as the only court established by our state constitution, has the inherent power to prescribe the conduct of judges of all the courts, and to discipline judges for their acts that violate the Code of Judicial Conduct."); *In re Ross,* 428 A.2d 858, 868 (Me.1981) ("[I]t is incumbent upon the Supreme Judicial Court to exercise that part of the judicial power involved in prescribing the conduct of judges and imposing discipline upon them for misconduct."). *See generally Dist. Court for Dist. IX v. Williams,* 268 A.2d 812, 813 (Me.1970) (holding that an executive branch agency is without authority to review an action taken by the judicial branch).

[¶ 9] Article VI, section 1, authorizes the Legislature to create other courts by statute. However, even when a court is created by legislative enactment, its judicial powers and authority are conferred by and subject to the constitution and the ethical requirements specified by the Supreme Judicial Court. *Ross,* 428 A.2d at 867–68. This authority extends to regulation of the conduct of judges of probate. *See generally In re Barrett,* 512 A.2d 1030 (Me.1986).

[¶ 10] Pursuant to its exclusive authority to regulate judicial conduct, as an exercise of the powers conferred upon the Judicial Branch, this Court has adopted the Code of Judicial Conduct. The purposes and goals of the Code are stated in the first paragraph of its preamble:

Our legal system is based on the principle that an independent, fair and competent judiciary is essential to our concepts of justice and the rule of law. The judge, as arbiter of facts and law for the resolution of disputes, is a highly visible symbol of government under the rule of law. Accordingly, the Maine Code of Judicial Conduct is founded on the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and must strive to maintain and enhance public confidence in our legal system.

Maine Code of Jud. Conduct Preamble.

[¶ 11] Judges of Probate are explicitly subject to the Code of Judicial Conduct, except for a few narrowly defined exceptions not relevant in this case. Code of Judicial Conduct, Part II, § 1.

[¶ 12] The case before us must be considered against this constitutional background of authority and responsibility placed upon the Supreme Judicial Court to regulate judicial conduct.

*B. Jurisdiction and Burden of Proof*

[¶ 13] "[T]he Supreme Judicial Court has exclusive original jurisdiction over all judicial disciplinary matters." *Mitchell v. Judicial Ethics Comm.,* 2000 ME 83, ¶ 5, 749 A.2d 1282, 1283. Therefore, when considering the report of the Committee, the Court sits as the court of original jurisdiction. *In re Cox,* 553 A.2d 1255, 1256 (Me.1989).

[¶ 14] "[T]he Committee bears the burden of proving the allegations contained in its report by a preponderance of the evidence." *Id.* at 1255. Judge Dunleavy, however, does not dispute any of the Committee's factual allegations and has waived his right to a factual hearing before this Court. He contends that, as a matter of law, his actions do not constitute action-

able violations of the Code. The Committee limited its determination to consideration of whether Judge Dunleavy's conduct was inconsistent with the Code and did not address whether the Code conflicts with a Maine statute or the Maine Constitution. We do so now.

## C. Canon 5(A)(3)

■ [¶ 15] Judge Dunleavy contends that Canon 5(A)(3) conflicts with 4 M.R.S.A. § 312 (Supp.2002) [10] and is therefore invalid. He suggests that section 312 supersedes Canon 5(A)(3) because the preamble of the Code requires that its provisions be applied consistently with statutes and constitutional requirements [11] and because section 312 was enacted more recently than Canon 5(A)(3). [12] Moreover, Judge Dunleavy maintains that because the Maine Constitution only prohibits sitting judges from simultaneously holding other public offices and not from running for them, Canon 5(A)(3) abridges the right of sitting judges to run for office and the voters' right to vote for a particular candidate.

[¶ 16] Canon 5(A)(3)'s requirement that a judge resign before becoming a candidate for any elected office (other than an incumbent judge of probate running for reelection) does indeed conflict with section 312's provision that "a person … holding the office of judge of probate may engage in any political activity that would be lawful for a candidate for any other

---

**10.** Section 312 provides:

As a candidate for the elective office of judge of probate or as an elected judge, a person seeking or holding the office of judge of probate may engage in any political activity that would be lawful for a candidate for any other elected county office or for an incumbent elected county official. Any such judge may hold any other elected office or offices not made incompatible by the Constitution of Maine.

4 M.R.S.A. § 312 (Supp.2002). Apparently, there is no dispute that this type of activity would be lawful for any other incumbent elected county official. Although section 312 could be read as applying only to campaigns for probate judge, thereby avoiding a conflict with the Code, which permits sitting probate judges to campaign for reelection, such a reading is not supported by the legislative history. The Statement of Fact in the relevant legislative document states:

This amendment clarifies the political activities in which an elected judge of probate may engage, *including seeking or holding other elected offices.*

L.D. 1609 (116th Legis.1994) (emphasis added). Moreover, in support of section 312, on the Senate floor, Senator Carey explained the perceived problem that section 312 sought to address as follows:

I would point out that we left out the judges of probate and they don't have the ability to campaign. *If they happen to be holding a*

*probate office they really can't campaign if they are running for another office,* they can't even campaign under the law to get reelected to their own post. This would clear up that matter.

6 Legis. Rec. S–1843 (1994) (emphasis added).

**11.** In pertinent part, the preamble states, "The Code sets forth rules of reason. It is to be applied consistent with constitutional requirements, statutes, rules of court, decisional law, and common sense and in the context of all relevant circumstances." Maine Code of Jud. Conduct Preamble.

**12.** We find no merit in Judge Dunleavy's argument that section 312 trumps Canon 5(A)(3) because the Legislature enacted section 312 in 1994, more recently than our publication of the Code. The general rule that a more recent statutory enactment controls when in conflict with an earlier statutory enactment, *State v. London,* 156 Me. 123, 129, 162 A.2d 150, 154 (1960), does not apply here because our comparison is not between two statutes. The purpose of this rule of construction is to give effect to legislative intent by seeking to determine which version of a statute the Legislature intended to control. *Id.* at 126, 162 A.2d at 152. Here, because our comparison is not between competing legislative enactments, the rule of construction does not apply.

elected county office or for an incumbent elected county official." Therefore, we must decide which provision prevails.

[¶ 17] Judge Dunleavy is correct that the preamble provides that the Code should be applied consistent with statutes, suggesting that section 312 might trump Canon 5(A)(3). However, *if a statute is unconstitutional, we could not apply it "consistent with constitutional requirements."* [13] Because we conclude that (1) to the extent it purports to authorize judicial conduct inconsistent with the Code, section 312 is an unconstitutional invasion by the Legislature of the Court's inherent and exclusive authority to regulate judicial conduct; and (2) Canon 5(A)(3) is constitutional; our application of the Code rather than the statute is consistent with the constitution and all constitutional statutes.

1. Constitutionality of 4 M.R.S.A. § 312 (Supp.2002)

[¶ 18] We adopted the Code in 1974 pursuant to the Supreme Judicial Court's inherent authority to discipline and sanction judges and grounded upon the fundamental need for an independent judiciary. *See In re Benoit*, 487 A.2d at 1170–71. Our authority is derived from two constitutional provisions: Article VI, section 1 of the Maine Constitution establishes our general authority by vesting the judicial power of the State of Maine "in [the] Supreme Judicial Court, and such other courts as the Legislature shall from time to time establish," ME. CONST. art. VI, § 1; *In re Ross*, 428 A.2d at 868, and

Article III, incorporating the separation of powers doctrine, divides the powers of our government into three distinct co-equal branches and prohibits the Legislature from exercising judicial powers, unless expressly directed or permitted by the constitution, ME CONST. art. III; [14] *Bd. of Overseers of the Bar v. Lee*, 422 A.2d 998, 1002 (Me.1980). Each branch of government is "severally supreme within [its] legitimate and appropriate sphere of action." *Ex parte Davis*, 41 Me. 38, 53 (1856). We have recognized that

> From this concept of separation of powers there is derived the inherent power of the Supreme Judicial Court. It is a fundamental principle of constitutional law that each department in our tripartite scheme has, without any express grant, the inherent right to accomplish all objects necessarily within the orbit of that department when not expressly allocated to, or limited by the existence of a similar power in, one of the other departments. The inherent power of the Supreme Judicial Court, therefore, arises from the very fact that it is a court and connotes that which is essential to its existence and functioning as a court.

*Lee*, 422 A.2d at 1002.

[¶ 19] Judge Dunleavy contends that in *Estate of McCormick*, 2001 ME 24, 765 A.2d 552, we recognized that the Legislature has a role in controlling or permitting extra-judicial conduct; therefore, section 312 is within the Legislature's authority. However, in that case we were not asked

**13.** *See supra* note 11.

**14.** Article III provides:
> Section 1. The powers of this government shall be divided into 3 distinct departments, the legislative, executive and judicial.
> Section 2. No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted.
>
> ME. CONST. art. III. While explicit in the Maine Constitution, this separation of powers doctrine is implicit in the United States Constitution. *Bd. of Overseers of the Bar v. Lee*, 422 A.2d 998, 1002 n. 7 (Me.1980).

to decide whether the statute to which we were referred violated the separation of powers. In *McCormick*, we rejected the appellant's argument that his due process rights had been violated when, in probate court, he was opposed by counsel who also served as a part-time probate judge. *Id.* ¶ 15, 765 A.2d at 558. Although we recognized the potential unfairness that might exist when the appellant, while appearing before one probate judge, is opposed by another probate judge-advocate with years of service on the bench, we found no due process violation and noted that despite widespread criticism, "[t]he Maine Legislature has addressed this issue and has continued to allow probate judges to maintain active probate practices." *Id.* ¶ 16, 765 A.2d at 559. While this statement might suggest that we recognized the Legislature's authority to address issues of potential judicial conflict and impropriety, we noted that the appellant had not challenged the constitutionality of the statute. *Id.*, 765 A.2d at 558. Therefore, we were not asked to consider whether the statute usurped our judicial authority.[15] Here, we are presented with that question and we

conclude that to the extent section 312 purports to authorize conduct by a judge that is prohibited by the Code, the statute does usurp our judicial authority and is therefore unconstitutional.

## 2. Constitutionality of Canon 5(A)(3)

[¶ 20] Having determined that section 312 is unconstitutional as applied, we now consider whether Canon 5(A)(3) is constitutional. Judge Dunleavy directly attacks the constitutionality of Canon 5(A)(3), relying on Article IX, section 2 of the Maine Constitution[16] and explaining that because section 2 only prohibits holding incompatible offices, not running for them, Canon 5(A)(3) infringes on his right to be a candidate for State Senate and the voters' right to elect him.

[¶ 21] The fact that the Maine Constitution only prohibits holding incompatible offices and is otherwise silent on the subject of judges running for non-judicial offices does not render Canon 5(A)(3) unconstitutional because no conflict exists between the Canon and the constitution.[17]

---

**15.** Although *Estate of McCormick*, 2001 ME 24, 765 A.2d 552, does not establish any authority for the Legislature to control or permit extra-judicial conduct, we have found that the Legislature has the constitutional power to enact statutes defining the duties of active retired judges because the constitution left to the Legislature the duty "to prescribe the number of Justices constituting the Court, their powers, emoluments, conditions of retirement, etc." *See Packard v. Whitten*, 274 A.2d 169, 176 (Me.1971). Moreover, the Legislature through joint action with the governor has the authority to remove judicial officers during their terms either by impeachment or address. ME. CONST. art. VI, § 4, art. IX, § 5.

**16.** Section 2 provides:
No person holding the office of ... judge of probate ... shall be a member of the Legislature; and any person holding either of the foregoing offices, elected to, and accepting

a seat in the Congress of the United States, shall thereby vacate said office; and no person shall be capable of holding or exercising at the same time within this State, more than one of the offices before mentioned.
ME. CONST. art. IX, § 2.

**17.** Prior to our adoption of the Code, we considered whether our constitution required a fish and game commissioner to resign before running for the State Legislature and concluded that it did not. *See Opinion of the Justices*, 95 Me. 564, 586, 51 A. 224, 232–33 (1901). However, our decision in that case, that the Constitution does not contain a "resign-to-run" requirement, does not support the conclusion that a "resign-to-run" requirement would be unconstitutional. *See also Lesieur v. Lausier*, 148 Me. 500, 506, 96 A.2d 585, 588 (1953) (holding that retention of the incompatible office of municipal judge beyond the commencement of the term of may-

The Code simply provides a more exacting restriction for judges than is provided in the constitution. Moreover, the law does not recognize either a constitutional right to run for a particular office or the right to vote for a particular candidate. *League of Women Voters v. Diamond*, 965 F.Supp. 96, 103 n. 5 (D.Me.1997). "Resign-to-run" requirements have withstood constitutional challenges in the United States Supreme Court and other courts. *Clements v. Fashing*, 457 U.S. 957, 972–73, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (holding that the Texas Constitution's "resign-to-run requirement" did not violate either the Equal Protection Clause of the Fourteenth Amendment or the First Amendment to the United States Constitution); *Morial v. Judiciary Comm'n*, 565 F.2d 295 (5th Cir.1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978); *Worthy v. Michigan*, 142 F.Supp.2d 806 (E.D.Mich.2000).

[¶ 22] We conclude that Canon 5(A)(3) rests on a rational predicate and does not violate the guarantees of equal protection, freedom of speech, or freedom of association in either the Maine or United States Constitutions. It rationally seeks to separate a judge's political, legislative, or executive branch ambitions from the judge's judicial decision-making to further the objective of maintaining a judiciary that is independent and impartial both in fact and in the public's perception.

▮ [¶ 23] Finally, Judge Dunleavy argues that Canon 5(A)(3) is void because the requirement that a judge resign his office before he seeks a non-judicial elective office is tantamount to his removal from office, which only the joint action of the Legislature and the Governor may require after an impeachment or an address. We disagree. Canon 5(A)(3) only requires

or operates as a declination or forfeiture of

a sitting judge to choose between a candidacy and the bench. It does not unconstitutionally usurp any authority belonging to our co-equal branches of government.

[¶ 24] Because 4 M.R.S.A. § 312 (Supp. 2002) is unconstitutional as applied and Canon 5(A)(3) is constitutional, Canon 5(A)(3) controls. We hold that Judge Dunleavy committed an actionable violation of Canon 5(A)(3) when he chose to run for the State Senate without resigning his position as probate judge.

D.   Canon 5(A)(1)(e)

[¶ 25] Judge Dunleavy contends that he also did not violate Canon 5(A)(1)(e) because the funds he solicited were not for a "political organization or candidate," rather he collected the funds for the Maine Clean Elections Fund; therefore, the funds did not go to any specific candidate or party. The Committee found that Judge Dunleavy's personal fund solicitation of 150 five-dollar contributions to qualify for public financing under the Maine Clean Elections Act, 21–A M.R.S.A. § 1125(3) (Supp.2002), violated Canon 5(A)(1)(e)'s prohibition on solicitation of funds for a political organization or candidate. We agree.

1.   Violation

▮ [¶ 26] Through Canon 5(A)(1)(e) we sought to prevent the appearance of, or the ultimate corruption of, the judicial process by preventing judges from soliciting contributions in support of their own political ambitions. The funds Judge Dunleavy collected entirely enabled his candidacy. Therefore, although the five-dollar contributions were not directly deposited in his campaign fund, they were solicited "for" his candidacy. Judge Dunleavy's personal solicitations, which ulti-

the office of mayor).

mately enabled his candidacy, exposed him to suggestions of bias and compromised the appearance of impartiality fundamental to the integrity of the judiciary. We conclude that his solicitation of Clean Elections Fund qualifying contributions violated Canon 5(A)(1)(e).

2. Constitutionality of Canon 5(A)(1)(e)

[¶ 27] Judge Dunleavy challenges the constitutionality of Canon 5(A)(1)(e) on the ground that it and the Code as a whole [18] "are a hodge-podge of prior restraint, vague standards and broad restrictions not tailored to protect any compelling state interest." [19] He also narrows his attack and argues that Canon 5(A)(1)(e) violates the First Amendment to the United States Constitution, relying on *Weaver v. Bonner*, 309 F.3d 1312 (11th Cir.2002); *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002); and *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 244 F.Supp.2d 72 (N.D.N.Y.2003), *on appeal, stay denied by Spargo v. N.Y. State*

*Comm'n on Judicial Conduct*, 2003 WL 2002762, 2003 U.S. Dist. LEXIS 7073 (N.D.N.Y. Apr. 29, 2003), to contend that the restrictions have a chilling effect on a candidate's ability to speak to potential contributors about their contributions and endorsements, and that the restrictions are impermissibly designed to make judicial elections different from legislative elections.[20]

[¶ 28] The Committee correctly notes an important distinction between the restrictions at issue in *White* and *Weaver* and this case. Both of those cases concerned restrictions on candidates for judicial office in states where judges are elected. In *Weaver*, the Eleventh Circuit, applying strict scrutiny, held unconstitutional the Georgia Code of Judicial Conduct's prohibition on candidates for judicial office personally soliciting campaign funds. *Weaver*, 309 F.3d at 1322–23. The court determined that these restrictions were not narrowly tailored to further the state's interest in judicial impar-

**18.** Although Judge Dunleavy initially challenges the constitutionality of the entire Code, he only develops his challenge with respect to the Canons 5(A)(1)(e), prohibiting solicitation of funds, and 5(C)(3), restricting solicitation of funds. Because he has not sufficiently briefed his argument with respect to the entire Code, and because we determine we need not consider his challenge to Canon 5(C)(3) for other reasons, *see infra* note 19, we only consider the constitutional challenge to Canon 5(A)(1)(e).

**19.** In addition to Canon 5(A)(1)(e), Judge Dunleavy also specifically challenges the constitutionality of Canon 5(C)(3). *See supra* note 3. He contends that a finding that he violated Canon 5(A)(1)(e) requires a finding that he violated Canon 5(C)(3) because they both involve prohibitions on solicitation of campaign funds. A finding that Dunleavy violated Canon 5(A)(1)(e) does not require a finding that he also violated 5(C)(3). Canon 5(C)(3), dealing with "Political Conduct for Candidates for Election as Judge of Probate,"

applies only to the fundraising activities of candidates for election or reelection as probate judge. Canon 5(C)(3) creates a limited exception to the general rule forbidding solicitation for probate judge candidates by allowing them to solicit contributions during a certain time period. Dunleavy was not running for reelection as probate judge; he was running for State Senate, and the Committee did not allege he violated Canon 5(C)(3). There is no reason for us to consider the constitutionality of Canon 5(C)(3).

**20.** We reject Judge Dunleavy's contention that Canon 5(A)(1)(e) draws a distinction between judicial elections and other elections. Canon 5(A)(1)(e) applies to all judges and applies equally to all types of elections. It is not a provision that applies only to candidates for judicial office in contrast to other offices. With the exception of probate judges, Maine's judges are appointed not elected. 4 M.R.S.A §§ 1, 2, 101, 157, 157–B, 161, 301 (1989 & Supp.2002).

tiality and completely and improperly chilled the candidate's right to speak to potential contributors and endorsers about their contributions and endorsements. *Id.* at 1322. The court explained that in a system where judges are publicly elected, it is necessary for judicial candidates to raise campaign funds. *Id.* at 1322–23. The fact that candidates could not do so personally did little to minimize the risk that they would be partial if elected because the candidates were permitted to raise funds and seek endorsements via their committees. *Id.* The court concluded, therefore, that the restriction did not survive strict scrutiny because it "completely chilled [a candidate] from speaking to potential contributors and endorsers about their potential contributions and endorsements," *id.* at 1322, "while hardly advancing the state's interest in judicial impartiality," *id.* at 1323.

[¶ 29] In *White*, the U.S. Supreme Court, applying a standard of strict scrutiny, held unconstitutional the Minnesota Code of Judicial Conduct's "announce clause." *White*, 536 U.S. at 788, 122 S.Ct. 2528. The Court held that the "announce clause," which prohibited candidates for judicial election from announcing their views on disputed legal issues, violated the First Amendment because it was "woefully underinclusive" and not narrowly tailored to serve a compelling government interest. *Id.* at 780–81, 122 S.Ct. 2528. Although the Court concluded that the "announce clause" was unconstitutional, Justice Kennedy, in his concurrence, specified that *White* did not present the question of "whether a State may restrict the speech of judges because they are judges," suggesting that the rationale of *Pickering v. Board of Education of Township of High School District 205, Will County,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) [21] and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) [22] might be extended to permit "a general speech restriction on sitting judges ... in order to promote the efficient administration of justice." *Id.* at 796, 122 S.Ct. 2528 (*Kennedy, J.*, concurring).

[¶ 30] Assuming that Canon 5(A)(1)(e) constitutes a restriction on speech rather than conduct [23] because it burdens a sitting judge's ability to talk to potential political contributors and endorsers about their contributions and endorsements for any political cause, we apply strict scrutiny and conclude that Canon 5(A)(1)(e) is narrowly tailored to serve a compelling state interest. *See White,* 536 U.S. at 775, 122 S.Ct.

---

21. In *Pickering*, the Court recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general" and that the Court's task is to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Township of High Sch. Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

22. In *Connick*, the Court reiterated the necessity of striking a balance between a citizen's interest in commenting on matters of public concern and the State's interest, as an employer, in promoting the efficiency of public services. *Connick,* 461 U.S. at 142, 103 S.Ct. 1684.

23. A restriction on expressive conduct, for which the government's purpose is unrelated to the suppression of expression (a content neutral restriction), need only satisfy the less stringent *O'Brien* four-factor test for evaluating restrictions on symbolic speech. *City of Erie v. Pap's A.M.,* 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (applying the test set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).

2528. To be narrowly tailored, the requirement must not " 'unnecessarily circumscribe protected expression.' " *Id.* (citation omitted).

[¶ 31] The State has a compelling interest in preserving the appearance of, and the impartiality of, the state judiciary. *See id.* at 775–78, 122 S.Ct. 2528 (impartiality meaning a "lack of bias for or against either *party* to the proceeding," which is essential to due process, in contrast to impartiality meaning "lack of preconception in favor of or against a particular *legal view*," for which the State has no compelling interest). Canon 5(A)(1)(e) is narrowly tailored to meet that interest because it applies only to conduct which presents the greatest risk to that interest; it prohibits sitting judges, as opposed to judicial candidates, from soliciting support for political candidates and political organizations, and from purchasing tickets to political dinners or functions. Maine Code of Jud. Conduct 5(A)(1)(e). It is exactly this activity that potentially creates a bias, or at least the appearance of bias, for or against a party to a proceeding. If a contribution is made, a judge might subsequently be accused of favoring the contributor in court. If a contribution is declined, a judge might be accused of punishing a contributor in court. Canon 5(A)(1)(e) applies only to sitting judges and applies equally to all political solicitations, regardless of content. We conclude that Canon

5(A)(1)(e) is constitutional and that Judge Dunleavy committed an actionable violation of Canon 5(A)(1)(e).[24]

E. Sanction

■■■ [¶ 32] Judge Dunleavy suggests that no disciplinary measure is appropriate because he, in good faith, believed that the statute, the Maine Constitution, and the United States Constitution superseded the Canons. As a test case, he argues, the Court should not impose sanctions because he has performed a service for others by forcing resolution of this issue. He concludes that his only choice was to "interpret the statute and Constitutions for himself and run or impose a possibly inapplicable restriction on himself because there was no other source of guidance." Finally, he suggests that we be guided in our decision by the Code's preamble, which states that not every transgression is expected to result in disciplinary action, and that the Court should apply the Code reasonably and consider the seriousness of the transgression, whether there is any pattern of improper activity, and the effect of the improper activity upon others in the judicial system.

■■■ [¶ 33] We have said that the purpose of sanctions is to deter future misconduct by the judge in question and to discourage others from engaging in similar conduct. *In re Cox,* 658 A.2d 1056, 1057–58 (Me.1995). Sanctions restore and reaf-

**24.** At oral argument, Judge Dunleavy drew our attention to the very recent United States District Court decision, *Spargo v. New York State Commission on Judicial Conduct,* 244 F.Supp.2d 72 (N.D.N.Y.2003), *on appeal, stay denied by Spargo v. N.Y. State Comm'n on Judicial Conduct,* 2003 WL 2002762, 2003 U.S. Dist. LEXIS 7073 (N.D.N.Y. Apr. 29, 2003). Assuming that *Spargo* was correctly decided, we find *Spargo* distinguishable because the challenged restrictions in that case broadly precluded participation in all political activity for sitting judges and candidates for

judicial office. *Spargo,* 244 F.Supp.2d at 88. The District Court concluded that such a broad restriction was not narrowly tailored to serve the state's compelling interest in an independent judiciary because it ignored the fact that those judges had at one time participated in partisan politics in their own judicial election campaigns. *Id.* Here, Canon 5(A)(1)(e) is more narrowly tailored because it only prohibits solicitation and the purchasing of tickets. As explained in note 17, in this case, we do not consider the other Code provision relating to political activity.

firm public confidence in the judicial system by communicating the Court's condemnation of judicial misconduct. *Id.* Here, Judge Dunleavy has not engaged in a pattern of unethical behavior and apparently acted in good faith and with an honest belief that the Code provisions at issue were both superseded by statute and unconstitutional. Moreover, there has been no allegation that Judge Dunleavy's candidacy compromised his judicial decisions and resulted in actual prejudice. However, Judge Dunleavy chose to proceed with his candidacy despite the September 10, 2002, Judicial Ethics Committee's advisory opinion indicating that, unless he resigned from the bench, his candidacy would result in a violation of the Code. The Commission's opinion, however, provided no guidance as to the constitutionality of section 312. Although Judge Dunleavy could have sought resolution of this issue in an action for declaratory judgment pursuant to M.R. Civ. P. 57, we have no reason to believe that he acted in bad faith when he ignored the Code's restrictions and followed the statute. Because no public purpose is served in this case by the imposition of a sanction, we impose none.

The entry is:

Judge Dunleavy erred.

LEVY, J., with whom CLIFFORD, J. joins, concurring.

[¶ 34] I join in the Court's opinion, but write separately to address in greater depth the application of the separation of powers doctrine established in Article III of the Maine Constitution to 4 M.R.S.A. § 312 (Supp.2002).

[¶ 35] The extra-judicial activity of judges of probate is an area of shared concern of the legislative and judicial branches of Maine government. The Judiciary's interest arises from the constitutional grant of "judicial power" contained in Article VI, section 1, which, at its very essence, assumes a duty to regulate the extra-judicial conduct of judges that bears on the integrity and impartiality of the judicial process. The Legislature's interest arises from its constitutional authority to enact "all reasonable laws and regulations for the defense and benefit of the people of this State," ME. CONST. art. 4, pt. 3, § 1, which has long been recognized to include legislation governing the qualifications and activities of candidates for elective office. *See Opinion of the Justices*, 623 A.2d 1258, 1262–63 (Me.1993) ("[W]e find no implicit basis for restricting the power residing in the Legislature to enact reasonable qualifications for [the offices of secretary of state, treasurer, or attorney general].").

[¶ 36] Because neither branch can claim an exclusive " 'textually demonstrable constitutional commitment' " on the subject, *State v. Hunter*, 447 A.2d 797, 800 n. 4 (Me.1982) (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)), the conflict between 4 M.R.S.A. § 312 and Canon 5(A)(3) is not resolved simply by determining within which of the two branches the regulatory power over probate judges *properly belongs*. ME. CONST. art. III, § 2 ("No person or persons, belonging to one of these departments, shall exercise any of the powers *properly belonging* to either of the others, except in the cases herein expressly directed or permitted." (emphasis added)); *see also Hunter*, 447 A.2d at 800.[25] When each branch's authority is necessarily "limited

---

25. In *Hunter*, the separation of powers inquiry was framed as follows: "Under the Maine Constitution, however, our inquiry is narrower: has the power in issue been explicitly granted to one branch of state government, and to no other branch? If so, article III, section 2 forbids another branch to exercise that power." 447 A.2d at 800.

by the existence of a similar power in [the other]," *Bd. of Overseers of the Bar v. Lee*, 422 A.2d 998, 1002 (Me.1980), principles of comity must guide our application of Article III. Accordingly, we have enforced statutes designed to regulate the licensure of attorneys—a subject squarely within the realm of judicial interest and authority— "as a matter of comity, but not in surrender of [the judiciary's] inherent power." *Id.* at 1003 (*citing In re Feingold*, 296 A.2d 492, 496 (Me.1972) ("Courts ... may and frequently do honor implementing legislation, but clearly are not bound to do so.")).

[¶ 37] Legislative enactments that address an issue of shared concern to the legislative and judicial branches should be upheld unless an enactment substantially interferes with the administration of justice or constitutes an unreasonable burden on judicial authority. *See id.* at 1003 (citing *State ex rel. Bushman v. Vandenberg*, 203 Or. 326, 280 P.2d 344, 348 (1955)) (invoking the doctrine of inherent judicial power to strike down a statute authorizing the removal of judges from cases because the statute was in the area of court procedure and an undue burden on the judiciary). This compels us to consider the degree to which 4 M.R.S.A. § 312 interferes with and burdens the judicial branch. Section 312 runs afoul of the constitutional separation of powers only if, by its operation, the Legislature is "unreasonably burdening or substantially interfering with the judicial branch." *State ex rel. Fiedler v. Senate*, 100, 155 Wis.2d 94, 454 N.W.2d 770, 772 (1990); *see also Lee*, 422 A.2d at 1003 (citing *Bushman*, 280 P.2d. at 348).

[¶ 38] I conclude that section 312 unreasonably burdens and substantially interferes with the Judicial Branch because active political participation by the judges of probate has a direct and detrimental impact in an area of primary concern to the judiciary: the maintenance of the integrity of the judicial process both in appearance and in fact. As established in the Preamble to the Code of Judicial Conduct, the regulation of the conduct of judges is essential to advancing the public's trust and confidence in the legal system:

> [T]he Maine Code of Judicial Conduct is founded on the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and must strive to maintain and enhance public confidence in our legal system.

Maine Code of Jud. Conduct Preamble. Canon 5(A)(3) exemplifies these precepts by ensuring that all judges, whether appointed or elected, will neither abuse their positions nor neglect their duties because of aspirations for higher office. *Clements v. Fashing*, 457 U.S. 957, 968, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982); *see also* Robert M. O'Neil, *National Symposium on Judicial Campaign Conduct and the First Amendment: The Canons in the Courts: Recent First Amendment Rulings*, 35 IND. L. REV. 701, 720 (2001). Numerous jurisdictions have recognized that reasonable restrictions on political activity by sitting judges are necessary to maintain the integrity of the judicial process. *See, e.g., Signorelli v. Evans*, 637 F.2d 853 (2d Cir.1980); *Morial v. Judiciary Comm'n of La.*, 565 F.2d 295 (5th Cir.1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978); *Suster v. Marshall*, 121 F.Supp.2d 1141 (N.D.Ohio 2000); *Wagner v. Milwaukee County Election Comm'n*, 263 Wis.2d 709, 666 N.W.2d 816 (2003); *Mitchell v. Judicial Ethics Comm.*, 2000 ME 83, 749 A.2d 1282; *State ex rel. Carenbauer v. Hechler*, 208 W.Va. 584, 542 S.E.2d 405 (2000); *In re Fadeley*, 310 Or. 548, 802 P.2d 31 (1990); *Judicial Qualifications Comm'n v. Lowenstein*, 252 Ga. 432, 314 S.E.2d 107 (1984); *Adams v. Sup. Ct. of Pa.*, 502 F.Supp. 1282 (M.D.Pa.1980).

[¶ 39] The reasonableness of the burden imposed by section 312 on the Judicial Branch must also be considered in terms of the consequences resulting from our invalidation of the statute. Section 312 is not essential to advancing the legislative interest of assuring that every Maine citizen, including a judge of probate, who wishes to actively participate in the political process is able to do so. Section 312 aside, a judge of probate may unilaterally free her or himself from Canon 5(A)(3)'s barrier to political participation by resigning from office or by not seeking reelection. *See Signorelli,* 637 F.2d at 858 ("New York's scheme ... confronts the prospective candidate with a choice: he may run for Congress if he is willing to resign his judgeship."). Because a judgeship is in the nature of a public trust, it is unreasonable to permit a judge to subjugate that trust to her or his personal desire to actively participate in the political process.

[¶ 40] For these reasons, I join the Court's conclusion that section 312 violates Article III of the Maine Constitution.